UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEBORAH LOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 18 C 1278 |
| | ) |
| CITY OF CHICAGO, and CHICAGO POLICE | ) Judge Rebecca R. Pallmeyer |
| OFFICERS LUKE OPOKA, Star No. 18952, | ) |
| JOHN THILL, Star No. 18988, JOSE HARO, | ) |
| Star No. 17323, and ROBERT LARSON, | ) |
| Star No.1119, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Relying on information from a confidential informant, Chicago Police Officers obtained a warrant in January 2018 to search 2210 E. 69th Street, Apartment 1W in Chicago, Illinois. The officers mistakenly searched Plaintiff Deborah Lott's apartment, which is in the same building but has a slightly different address: 2208 E. 69th Street, Apartment 1W. The only marking on Plaintiff's door is "1W." Shortly after the officers entered the apartment, Plaintiff looked at the search warrant and informed them that her address was 2208, not 2210. The officers apologized and promptly exited, but two of them returned a few minutes later to request a piece of mail that would confirm the address. Plaintiff's mail confirmed that she lived in a 2208 apartment, so the officers apologized again and left for good. This federal lawsuit followed. Defendants are the City of Chicago (the "City") and four Chicago Police Officers: Officer Luke Opoka, Officer Jose Haro, Officer John Thill, and Sergeant Robert Larson.[1] Plaintiff asserts claims under 42 U.S.C. § 1983 against the Defendant police officers for unreasonable search, unreasonable

---

[1] Plaintiff's Complaint named seven additional Chicago Police Officers: Sean Bottom, Nicholas Pocius, Brandon McDonald, Daniel Sheehy, Curtis Smith, Christa Barton, and James Palarczyk. (*See* Compl. [1], ¶¶ 5-8, 10-12.) Pursuant to joint stipulations, Plaintiff voluntarily dismissed her claims against these officers with prejudice. (*See* Apr. 11, 2019 Order [38]; Dec. 10, 2018 Order [24]; Pl.'s L.R. 56.1 Resp. [40], ¶ 5.)

seizure, and failure to intervene, in violation of the Fourth Amendment. She also asserts a claim against all Defendants for state-law trespass. Finally, she asserts a claim for indemnification against the City under 745 ILCS 10/9-102. Defendants now move for summary judgment on all claims. For the reasons stated herein, Defendants' motion is granted.

## BACKGROUND

### A. The Procurement and Issuance of the Search Warrant

The events giving rise to this lawsuit began in early January 2018, when a confidential informant ("J. Doe") whom Officers Opoka and Haro had previously arrested, tipped them off to alleged drug activity in a Chicago residence. (*See, e.g.*, Pl.'s L.R. 56.1 Resp. ¶¶ 7-8, 12-13, 17-18.) J. Doe told Officer Opoka that "he/she had been purchasing Xanax from Jarquez Robinson . . . about 3-4 times per month for approximately 2-3 years" at the following address: 2210 E. 69th Street, Apartment 1W, Chicago, Illinois. (*Id.* ¶ 18.) J. Doe also stated that the building at that address "was a four[-]story multi-unit red brick apartment building," and that Robinson lived in a second-floor apartment with a door marked "1W." (*Id.* ¶¶ 9, 13.) On a date the parties do not specify, Officers Opoka and Haro "drove the J. Doe past the building at 2210 E. 69th Street." (*Id.* ¶ 24.) "J. Doe showed them which door to enter and told them they would go up the first flight of stairs and go to the door on the right." (*Id.*)

"Officer Opoka communicated with the J. Doe multiple times leading up to January 12, 2018." (*Id.* ¶ 27.) Based on their conversations, "Officer Opoka believed that the J. Doe was being truthful and providing accurate information." (*Id.*) Accordingly, Officer Opoka drafted a "Complaint for Search Warrant and Search Warrant." (*Id.* ¶ 28.) A lieutenant in the Chicago Police Department and an assistant state's attorney approved the submissions. (*See id.* ¶¶ 32-33.) On January 11, 2018, Officer Opoka and J. Doe appeared before a judge in the Circuit Court of Cook County, Illinois. (*See id.* ¶ 34; Complaint for Search Warrant, Ex. A to Defs.' L.R. 56.1 Stat. [35-2], QH0001-3).) J. Doe swore to the contents of the Complaint; Officer Opoka presented information concerning J. Doe's criminal history and "possible pending investigations"; and the

judge questioned J. Doe.  (Pl.'s L.R. 56.1 Resp. ¶¶ 34-35.)  The judge "approved and signed the search warrant" that same day.  (*Id.* ¶ 36.)  The warrant identified the search target as Robinson; the things to be seized as Xanax (among others); and the place to be searched as "2210 E. 69th Street Apartment 1W, multi-unit red brick apartment building approximately 4 floors, Chicago, Cook County, Illinois."  (*Id.*)  The warrant itself did not state that Apartment 1W was on the second floor, but the Complaint for Search Warrant did.  (*See id.* ¶ 31; Complaint for Search Warrant QH0001.)

Sergeant Larson and Officer Thill "did not assist in procuring the Search Warrant and did not have any contact with" J. Doe.  (Pl.'s L.R. 56.1 Resp. ¶ 38.)  Officer Haro had only "limited interactions" with J. Doe and "did not draft the Complaint for the Search Warrant or the Search Warrant."  (*Id.* ¶ 39.)

**B.     The Video and Photograph Allegedly Taken By J. Doe**

Defendants maintain that at some point, J. Doe recorded a video that showed him entering the building at 2210 E. 69th Street, walking up a flight of stairs, and approaching the door on the right marked 1W.  (*See* Defs.' L.R. 56.1 Stat. [35] ¶ 10.)  Officer Opoka testified at his deposition that the video showed only two doors at the top of the stairs:  one unmarked door and the door marked 1W.  (Opoka Dep., Ex. B. to Defs.' L.R. 56.1 Stat. [35-3], 57:4-9.)  He further testified that because "the last image you see [on the video] is of Door 1W," the video implied that that was Robinson's door.  (*Id.* at 57:10-24.)  Officer Opoka never obtained a copy of the video; rather he testified that J. Doe showed it to him on his/her cell phone.  (*See id.* at 16:13-17; *see also* Pl.'s L.R. 56.1 Resp. ¶ 10 (noting that the video is not in the record).)  Plaintiff contends that the video did not necessarily depict the building at 2210 E. 69th Street because "there is no testimony that [it] showed the address of the building being entered."  (Pl.'s L.R. 56.1 Resp. ¶ 10.)  She also argues that the video did not necessarily indicate that "the door marked '1W' was the target of the search warrant."  (*Id.* (noting that according to Officer Opoka's deposition testimony, "[t]he video [did] not show J. Doe knocking on either door" or contain "any narration" about the door

3

marked 1W).)

Defendants contend that in addition to showing Officer Opoka the video, J. Doe provided him with a photograph "of the same door marked 1W that was seen in the video." (Defs.' L.R. 56.1 Stat. ¶ 11; *see* Door Photograph, Ex. D to Defs.' L.R. 56.1 Stat. [35-5]).) Plaintiff maintains that the record lacks "competent testimony" regarding the photograph's authenticity, including who took it, when it was taken, and what it depicts. (Pl.'s L.R. 56.1 Resp. ¶ 11.) She argues that photograph is therefore inadmissible. (*See id.*) Defendants concede that Officer Opoka was "unable to retrieve the metadata for the photograph" and that he did not present the photograph (or the video) to the judge who signed the search warrant. (*See* Defs.' L.R. 56.1 Resp. [45], ¶¶ 3-5.) Officer Opoka did, however, testify that J. Doe took the photograph and sent it to him via text message. (*See* Defs.' L.R. 56.1 Stat. ¶ 11 (citing Opoka Dep. 12:6-9, 14:1-8).)

### C. Execution of the Search Warrant

As noted, the search warrant identified the place to be searched as 2210 E. 69th Street, Apartment 1W. Plaintiff's apartment is located at 2208 E. 69th Street, Apartment 1W. (Defs.' L.R. 56.1 Resp. ¶ 1.) The Defendant police officers executed the search warrant on January 12, 2018. (Pl.'s L.R. 56.1 Resp. ¶ 40.) First, they met at the Chicago Police Department's 22nd District Tactical Office, where Sergeant Larson and Officer Opoka "discussed everyone's roles [in the search], the address of the building and the apartment, the layout of the target's [Robinson's] apartment, who the target was, [and] what the search warrant was for." (*Id.* ¶ 44.) According to Defendants, Officer Opoka showed the other officers "the picture of the door marked 1W" that J. Doe had allegedly provided. (Defs.' L.R. 56.1 Stat. ¶ 46 (citing Opoka Dep. 15:16-22 (Officer Opoka testimony that he showed the photograph to his colleagues "[p]rior to executing the search warrant"); Larson Dep., Ex. F to Defs.' L.R. 56.1 Stat. [35-6], 9:14-15, 12:14-24 (Sergeant Larson testimony that "Officer Opoka had a picture of the apartment door" and showed it to the officers on his phone at the "pre-execution" meeting); Thill Dep., Ex. G to Defs.' L.R. 56.1 Stat. [35-7], 10:23-11:6, 35:16-18 (Officer Thill testimony that he saw a photograph of the apartment door on

Officer Opoka's phone, "[p]robably during" the pre-execution meeting).) Plaintiff denies that Officer Opoka showed the photograph to the other officers before they executed the search warrant. (*See* Pl.'s L.R. 56.1 Resp. ¶ 46.) In support, she cites only the deposition testimony of Officer Haro, who testified that before the officers executed the warrant, he was "never shown the picture that said 1W on it." (Haro Dep., Ex. D. to Pl.'s L.R. 56.1 Resp. [42-4], 18:7-10; *see* Pl.'s L.R. 56.1 Resp. ¶ 46 (citing same); *but see* Haro Dep. 13:19-14:7 (testifying that at some point during the pre-execution meeting, he was "on Google Maps" obtaining information about nearby hospitals in case someone was hurt, and "didn't know what was taking place" among the other officers).)

Sergeant Larson and Officer Thill testified that as they approached the building to execute the search warrant, they could see two address numbers on the front door: 2208 and 2210. (Pl.'s L.R. 56.1 Resp. ¶ 47.) The video from Sergeant Larson's body camera shows that a pane of glass on the left side of the front door was marked with the number 2208, and a pane of glass on the right side of the front door was marked with the number 2210. (*See* Defs.' L.R. 56.1 Resp. ¶ 10; *see* Larson Video Footage, Ex. I to Defs.' L.R. 56.1 Stat. [37-1].)[2] In other words, the apartments at 2208 and 2210 E. 69th Street share a front entrance. (*See id.*) The officers used force to enter the building through the front door, which was the same entrance that J. Doe had previously shown Officers Opoka and Haro when they drove past the building. (Pl.'s L.R. 56.1 Resp. ¶ 48.) The front door led to a vestibule and a second locked door, which the officers used force to open. (*Id.*; *see also* Larson Video Footage.) The second door led to the inside of the building, where there was only one staircase. (*See* Larson Video Footage.) The officers walked up the first flight of stairs to the second floor of the building. (Pl.'s L.R. 56.1 Resp. ¶ 50; *see* Larson Video Footage). There was an unmarked door at the top of the staircase, a landing, and

---

[2] Each of the Defendant officers wore a body camera while executing the search warrant. (Pl.'s L.R. 56.1 Resp. ¶ 40.)

a door marked 1W to the right of the landing. (Pl.'s L.R. 56.1 Resp. ¶ 50; *see* Larson Video Footage.) "[T]here were no markings or indications" that one apartment was 2208 and the other was 2210. (Pl.'s L.R. 56.1 Resp. ¶ 51.)

The officers approached the door marked 1W. (*Id.* ¶ 52.) Defendants contend that it "was the same door that was in the photograph" J. Doe had sent to Officer Opoka. (*See* Defs.' L.R. 56.1 Stat. ¶ 52; *see also, e.g.*, Opoka Dep. 52:9-15 (Officer Opoka testimony that the door matched the one in the video and photograph from J. Doe).) Plaintiff argues that "[t]here is no competent testimony that" the photograph from J. Doe depicted the "same door" as the one the officers approached. (Pl.'s L.R. 56.1 Resp. ¶ 52.) The parties agree, however, that there was only one door marked 1W on the second floor of the building. (*See, e.g.*, Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp.") [39], 2; Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mot.") [34], 2.) And there is no evidence in the record that there was another door marked 1W anywhere else in the building. Sergeant Larson knocked on the door and announced himself with the words, "Chicago Police, search warrant." (Pl.'s L.R. 56.1 Resp. ¶ 53.) Plaintiff opened the door. (*Id.*) Sergeant Larson entered the apartment, remained in the entryway, and told Plaintiff that the officers had a search warrant. (*Id.* ¶ 54.) In response to his question, Plaintiff told Sergeant Larson that she lived in the apartment and that her children were also present. (*Id.* ¶ 56.) Sergeant Larson directed other officers to "look back there, make sure nobody else is in here." (*Id.* ¶ 57.) Officers Opoka and Thill entered the apartment, remained in the entryway for a short time, and then walked down the hallway to see whether others were inside. (*Id.* ¶¶ 58, 59.) Officer Haro, too, entered the apartment and remained in the front entryway. (*Id.* ¶ 60.)

While Officers Opoka and Thill were looking around the apartment, Sergeant Larson asked Plaintiff whether she knew Robinson. (*Id.* ¶ 61.) Plaintiff stated that she did not, and that the officers had the wrong apartment. (*Id.*) She also asked, "What was that address, can I see it?" (*Id.* ¶ 62.) When Sergeant Larson responded that the address was 2210, Plaintiff told him, "this is 2208." (*Id.*) Within 14 to 15 seconds of Plaintiff stating that her apartment number was

2208, Sergeant Larson ordered the officers to leave the apartment, and they complied. (*Id.* ¶ 63.) Officers Haro and Thill had been in the apartment for less than a minute; Officer Opoka had been in the apartment for about a minute; and Sergeant Larson had been in the apartment for a little over a minute and a half. (*Id.*) Officer Haro apologized to Plaintiff, and Sergeant Larson asked her "multiple times if she was okay and provided her with his name and his assigned district." (*Id.* ¶¶ 64-65.) Plaintiff was never handcuffed during this encounter. (*Id.* ¶ 55.)

Sergeant Larson and Officers Opoka, Haro, and Thill testified that "at the time they entered the apartment," they "believed that they had entered the right apartment." (Pl.'s L.R. 56.1 Resp. ¶ 66.) Plaintiff admits that the officers provided this testimony but denies that their belief was reasonable. (*Id.*) After leaving Plaintiff's apartment, the officers went to the vestibule "to figure out" the building's addresses. (*Id.* ¶ 67.) "[T]here was confusion as to which side of the building was 2208 and which side was 2210." (*Id.*) While the officers were in the vestibule, "a resident of the building returned home and tried to explain the addresses and unit designations in the building." (*Id.* ¶ 68.) But the officers were still confused; they did not know if Plaintiff's address "was 2208 as she said or if it was really 2210 and they had been in the right place." (*Id.*) Sergeant Larson and Officer Thill returned to Plaintiff's apartment so that they could "see some mail" to verify her address. (*Id.* ¶ 70.) Officer Thill knocked on Plaintiff's door and she answered. (*Id.* ¶ 71.) He "asked her if she had any mail that said 2208 so that they could wrap up." (*Id.*) Plaintiff handed him a piece of mail that said "2208 E. 69th Street." (*Id.*) Officer Thill then asked her if the apartment across the hall was 2210. (*Id.*) Plaintiff said that she did not know. (*Id.*) Officer Thill apologized and left. (*Id.* ¶ 73.) "During this interaction with Plaintiff, Officer Thill stepped just inside of her door for about 30 seconds." (*Id.* ¶ 72.) As far as the court can tell, Sergeant Larson stood in the hallway outside of Plaintiff's apartment. (*See, e.g.*, Larson Video Footage; Defs.' Reply [44], 5.)

Plaintiff Lott alleges that these circumstances establish violations of her rights under the Fourth Amendment and also asserts a state-law trespass claim. Defendant officers move for

7

summary judgment, arguing that the warrant was valid when issued and that the search was conducted in good faith. For the reasons explained here, the motion is granted.

## **DISCUSSION**

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that occurs, the non-moving party must "go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.* at 324. When ruling on a motion for summary judgment, a court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255; *see also, e.g.*, *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (the non-moving party receives "the benefit of reasonable," but "not speculative," inferences from the evidence). The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009).

Plaintiff's claims for unreasonable search, unreasonable seizure, and failure to intervene are brought under 42 U.S.C. § 1983, which creates a private cause of action against any person who, under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Individual liability under Section 1983 "requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation marks omitted); *see also id.* (stating that a plaintiff

must "demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct"). As discussed below, Plaintiff alleges violations of the Fourth Amendment of the U.S. Constitution, as incorporated against the state through the Fourteenth Amendment, which prohibits "unreasonable searches and seizures" and requires that a warrant may be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

### A. Search and Seizure Claims

Plaintiff claims that the Defendant police officers violated the Fourth Amendment by executing the search warrant unreasonably and detaining her in the process. According to Plaintiff, she suffered these constitutional violations twice: once when the Defendant police officers entered her apartment for the first time, and again when Sergeant Larson and Officer Thill returned to her apartment and asked to see a piece of mail.

A search or seizure may violate the Fourth Amendment because it was either (1) based on an invalid warrant or (2) unreasonably executed. *See, e.g.*, *Guzman v. City of Chi.*, 565 F.3d 393, 396 (7th Cir. 2009); *Jones v. Wilhelm*, 425 F.3d 455, 462 (7th Cir. 2005). Plaintiff appears to concede that the warrant was valid when issued. The court therefore comments briefly on the validity of the warrant, and then turns to the parties' arguments concerning the execution of the warrant.

#### 1. Validity of the Warrant

The Fourth Amendment requires a warrant to be supported by probable cause and to describe the place to be searched and the persons or things to be seized with particularity. *See* U.S. CONST. amend. IV. Defendants argue, and Plaintiff does not dispute, that the search warrant was supported by probable cause. (*See* Defs.' Mot. 5-10; Pl.'s Opp. 5-10.) And although Plaintiff correctly notes that "a search that is conducted pursuant to a warrant that fails to adhere to the particularity requirement is unconstitutional," (*see* Pl.'s Opp. 5; *see also, e.g.*, *Jones*, 425 F.3d at 462), she does not appear to argue that the warrant was invalid when issued for lack of

9

particularity. Rather, as discussed below, she maintains that the Defendant police officers "should have known" that the warrant "did not describe plaintiff's apartment." (*Id.* at 6.) The court interprets this argument as one concerning the execution of the warrant, not its issuance. *Cf. Jones*, 425 F.3d at 462-64 (determining that a warrant was valid when issued despite that its scope "turned out to be ambiguous," but finding that plaintiffs' clearly-established rights were violated because the warrant was executed by an officer who knew that it was ambiguous).

No basis for a challenge to the particularity of the warrant appears here. The Fourth Amendment's particularity requirement protects against "wide-ranging exploratory searches" and ensures that a place will be searched only if there is probable cause to do so. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). To satisfy the particularity requirement, a warrant's description need only be "such that the officer with [the] search warrant can, with reasonable effort ascertain and identify the place intended." *United States v. Kelly*, 772 F.3d 1072, 1081 (7th Cir. 2014) (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)). "[M]inor technical errors or omissions," such as typographical errors in addresses, "do not automatically invalidate a warrant so long as there is no danger that the officers might inadvertently search the wrong place." *Kelly*, 772 F.3d at 1081; *see also United States v. McMillian*, 786 F.3d 630, 640 (7th Cir. 2015) (same). Significantly, "[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing [judge]." *Garrison*, 480 U.S. at 85; *see also Guzman*, 565 F.3d at 396; *Jacobs v. City of Chi.*, 215 F.3d 758, 768 (7th Cir. 2000) (a court does not "judge the validity of a warrant '[w]ith the benefit of hindsight'" (quoting *Garrison*, 480 U.S. at 85)). "Information that emerges after the warrant is issued has no bearing on this analysis." *Guzman*, 565 F.3d at 396.

Based on information obtained from J. Doe and communicated to the judge, Officer Opoka obtained a warrant to search "2210 E. 69th Street Apartment 1W" in a "multi-unit red brick apartment building" with "approximately 4 floors" in Chicago, Illinois. (Pl.'s L.R. 56.1 Resp. ¶ 36.) Defendants concede that "the information received from the J. Doe turned out to be incorrect."

(Defs.' Reply 10-11.) But Plaintiff does not argue or offer any evidence that Officer Opoka "concealed information from the issuing [judge] that [he] w[as] under a duty to disclose." *Jacobs*, 215 F.3d at 768. Accordingly, the record supports only one reasonable conclusion: the warrant was valid when issued based on the information that Officer Opoka provided to the judge. *See id.* (concluding that "although the warrant turned out to be overbroad because it did not describe with particularity the place to be searched and encompassed a separate dwelling unit . . . for which there was no probable cause to authorize a search, it was valid at the time it was issued based on the information the officers presented to the magistrate"); *Jones*, 425 F.3d at 462 (similar). To the extent Plaintiff asserts claims against the Defendant police officers for allegedly procuring an invalid warrant, the court grants summary judgment in Defendants' favor.

### 2. Execution of the Warrant

Plaintiff claims that the Defendant police officers "unreasonably executed a search warrant on the wrong apartment"—twice. (Pl.'s Opp. 5.) "[A]n erroneous description in a warrant does not necessarily invalidate the subsequent execution of a warrant search." *Jones*, 425 F.3d at 464. "Even if a warrant is ultimately found to be . . . lacking in particularity, searches conducted pursuant to the warrant may be valid under the good-faith exception set forth in" *United States v. Leon*, 468 U.S. 897, 926 (1984). *Jones,* 425 F.3d at 464. The exception applies only if "the officers conducting the search . . . manifested an objective good-faith belief in the validity of the warrant." *Id.* "Execution of search warrants, therefore, should be examined in light of 'the need to allow some latitude for honest mistakes that are made by officers in [this] dangerous and difficult process.'" *Id.* (quoting *Garrison*, 480 U.S. at 87). But "mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Garrison*, 480 U.S. at 87 n.11 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). For example, "[a] warrant cannot be executed by persons who know it to be ambiguous." *Guzman*, 565 F.3d at 397 (citing *Garrison*, 480 U.S. at 87); *see also Jones*, 425 U.S. at 466 (officer's "decision . . . to proceed with the execution of a search warrant he knew to be ambiguous violated the [plaintiffs'] Fourth

11

Amendment rights"). "[I]f an officer obtains information while executing a warrant that puts him on notice of a risk that he could be targeting the wrong location, then the officer must terminate his search." *Jones*, 425 F.3d at 464 (citing *Garrison*, 480 U.S. at 87); *see also, e.g.*, *Jacobs*, 215 F.3d at 769 (similar).

Recently, the Seventh Circuit has explained that its "caselaw requiring officers to abandon a search addresses scenarios in which the warrant *plainly* did not describe the location to be searched." *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1059 (7th Cir. 2018) (emphasis added). A warrant plainly does not describe the search location when, for example, it "describe[s] a single-family home and the officers arrive[] to find a multi-unit building." *Id.* (citing *Guzman*, 565 F.3d at 397-98; *Jacobs*, 215 F.3d at 771); *see also, e.g.*, *Jones*, 425 F.3d at 463 (finding that an officer should have terminated a search and sought "clarification of [the] warrant" where he "knew before he executed the warrant that the phrase 'upstairs apartment on the right' would lead him to a different apartment depending on which staircase taken"). By contrast, officers need not call off a search when they discover "minor inconsistencies" between the description of the search location in the warrant and the location as the officers encounter it. *Edwards*, 907 F.3d at 1059 (determining that the "small, cluttered" nature of the plaintiffs' basement—which the plaintiffs argued was "inconsistent with it being a site to run a heroin operation"—did not give officers "good reason to believe they were searching the wrong home" for heroin and a drug dealer). With these principles in mind, the court considers the Defendant police officers' first and second entries into Plaintiff's apartment.

### a. First Entry

Defendants argue that there is no genuine dispute that their first entry into Plaintiff's apartment was a reasonable execution of the search warrant. (*See* Defs.' Mot. 11-12.) The warrant authorized a search of 2210 E. 69th Street, Apartment 1W. Defendants emphasize that 2208 and 2210 apartments at E. 69th Street are located in the same building with a shared front entrance, which is the same entrance that J. Doe identified for Officers Opoka and Haro. (*See*

12

*id.*) It is undisputed that the Defendant police officers used that entrance, proceeded through the vestibule door, climbed the first flight of stairs, and executed the search warrant on the apartment marked 1W. Defendants point out that Apartment 1W was to the right of the stairs, just as J. Doe said it would be, and that the only other apartment on the floor was unmarked. (Defs.' Mot. 12; *see also id.* at 5 (stating that there was only one apartment marked 1W "in the building containing 2208-2210 E. 69th Street").) Sergeant Larson, moreover, testified that he saw the photograph from J. Doe at the pre-execution meeting, and that the door to Apartment 1W matched the door in the photograph. (*See* Defs.' Mot. 12; Larson Dep. 37:9-11.) Officers Opoka and Thill testified to the same effect. (*See* Defs.' Reply 10; Thill Dep. 35:16-18; Opoka Dep. 52:11-13.) Officer Opoka also testified that the door to Apartment 1W matched the one in the video J. Doe had shown him. (*See* Defs.' Mot. 5 (citing, *inter* alia, Opoka Dep. 52:14-15).) And all of the Defendant police officers testified that when they first entered Plaintiff's apartment, they believed they were entering the apartment identified in the warrant. (*See* Pl.'s L.R. 56.1 Stat. ¶ 66.) For these reasons, Defendants contend that they "had no reason to believe Plaintiff's apartment, which was Apartment 1W in the building containing 2208-2210, was not the correct apartment." (Defs.' Reply 11.)

Plaintiff responds that the Defendant police officers should have known that her apartment had a 2208 address, and therefore should have known that the warrant did not authorize the search. (*See* Pl.'s Opp. 6.) Her argument rests entirely on the fact that the front entrance to the building was marked with both street numbers 2208 and 2210. In particular, Plaintiff contends that because the number 2208 was on the left side of the front entrance and the number 2210 was on the right, it was apparent that all 2208 apartments were on the left side of the building and all 2210 apartments were on the right. (*See id.* at 1, 6.) A reasonable police officer, Plaintiff maintains, would have recognized that her apartment was on the left side of the building; had a 2208 address; and was not the target of the search warrant. (*See id.* at 6; *see also id.* (arguing that "[a]t a minimum," there is a genuine dispute about whether the Defendant police officers

13

"should have known that they were executing a search warrant on the wrong apartment").)

Plaintiff's theory does not persuade the court that there is a fact issue for a jury. This is not a case in which the warrant "plainly did not describe the location to be searched." *Jolliff-Blake*, 907 F.3d at 1059. To the contrary, the warrant authorized a search in a multi-unit apartment building at 2210 E. 69th Street, and that is exactly where the Defendant police officers went to conduct the search. Further, the warrant authorized the Defendant police officers to search Apartment 1W, and that is exactly what they did. And Plaintiff does not dispute that the Defendant police officers followed J. Doe's instructions exactly: they ascended the first flight of stairs, turned right, and proceeded to the apartment marked 1W. (Pl.'s L.R. 56.1 Resp. ¶¶ 13, 24.) No reasonable jury could conclude that the two numbers on the front entrance would have "given the officers good reason to believe they were searching the wrong home." *Jolliff-Blake*, 907 F.3d at 1059. The fact that the front entrance displayed two addresses, for example, does not necessarily suggest that there was an Apartment 1W at both addresses. Indeed, the parties agree that there was only one Apartment 1W on the second floor and that it was not marked 2208 *or* 2210. Relatedly, the record lacks evidence that there was another Apartment 1W in the building.

In a similar vein, although Plaintiff maintains that the front entrance "clearly" indicated that all 2208 apartments are on the left side of the building and all 2210 apartments are on the right (*see* Pl.'s Opp. 1, 6), she has not offered evidence that confirms the building was laid out in this manner. And although Sergeant Larson and Officer Thill testified that they saw the numbers 2208 and 2210 on the front entrance before they entered the building (*see id.* at 6), Plaintiff has not pointed to testimony by either Defendant that, upon seeing the addresses on the entrance, he believed something might be awry. In fact, Sergeant Larson testified that the addresses led him to believe he was in the right place (*see* Defs.' Reply 8; Larson Dep. 35:7-15), and all four officers testified that when they entered Plaintiff's residence, they believed they were in the correct location. This case, therefore, is unlike *Jones*, where the officers knew before executing the search that the building had "two sets of staircases facing opposite directions," and therefore

14

knew or should have known that the phrase "upstairs apartment on the right" in the warrant was ambiguous. *Jones*, 425 F.3d at 463-65. It also differs from *Jacobs* and *Guzman*, where the officers executed searches in multi-unit buildings despite that the warrants described single-family homes. *Guzman*, 565 F.3d at 397-98; *Jacobs*, 215 F.3d at 768-71.

Urging the court to conclude otherwise, Plaintiff notes that the Defendant police officers "were confused" when they exited her apartment. (Pl.'s Opp. 7.) But as already discussed, all four officers testified that they initially thought they were in the right place. The record contains no evidence that the officers were confused until Plaintiff told them that her address was 2208. Accordingly, the record does not permit a reasonable inference that some feature of the building—such as the front entrance—gave notice of a risk that the officers were targeting the wrong apartment. Plaintiff next contends that in the body camera footage, the officers "can be seen and heard looking at and discussing the fact that the address numbers on the front door . . . do not indicate Plaintiff's apartment is the location described on the warrant." (*Id.*) This argument fails for the same reason: there is no evidence that the officers were confused before they spoke with Plaintiff. Furthermore, Plaintiff's representation of the body camera footage is misleading. Plaintiff's suggests that the video shows the officers looking at the numbers on the door and realizing their mistake. She admits, however, that even after the officers discussed the numbers on the door and spoke with a resident they encountered in the vestibule, they remained confused about "which side of the building was 2208 and which side was 2210." (*See* Pl.'s L.R. 56.1 Stat. ¶¶ 67-68.) If anything, the officers' ongoing confusion weakens Plaintiff's argument that the numbers on the front entrance would, on their own, suggest that Apartment 1W had a 2208 address.

Next, Plaintiff contends that the Defendant officers improperly used the photograph from J. Doe to "expand or alter the scope of the search warrant they were executing." (Pl.'s Opp. 8.) Plaintiff emphasizes that the officers did not show the photograph to the judge who issued the warrant and did not properly authenticate it. (*See id.*) But the officers' testimony that the

15

photograph matched Plaintiff's door is not necessary to the court's conclusion that there is no genuine dispute concerning the reasonableness of the first search. Rather, as discussed above, this conclusion follows from the fact that the Defendant police officers executed the search at the building identified in the warrant; followed, to a tee, the verbal instructions that they undisputedly received from J. Doe; and searched the only apartment marked 1W at the top of the first flight of stairs—which itself was not marked with 2208 or 2210. The testimony concerning the photograph simply provides additional support for the court's conclusion, and Plaintiff's arguments for discounting it are weak. First, there is no evidence that the officers used the photograph to resolve any perceived ambiguity in the search warrant. Sergeant Larson, Officer Opoka, and Officer Thill merely testified that the door to Apartment 1W matched the one in the photograph. (*See* Defs.' Mot. 12; Defs.' Reply 10; Larson Dep. 37:9-11; Opoka Dep. 52:11-13; Thill Dep. 35:16-18.) Second, Plaintiff argues that there is no "competent testimony" concerning who took the photograph and when. (Pl.'s Opp. 9.) That is incorrect. Officer Opoka testified that J. Doe took the photograph, and three officers testified that they saw it at the pre-execution meeting. (Opoka Dep. 12:6-9, 14:1-8; Larson Dep. 9:14-15, 12:14-24; Thill Dep. 10:23-11:6, 35:16-18.) Plaintiff's protestations concerning the photograph do not demonstrate that the reasonableness of the search is a disputed factual issue.

The court recognizes that in some cases, a jury must decide the question whether reasonable officers should have known that they were executing a warrant at the wrong location. (*See* Pl.'s Opp. 6-7.) Plaintiff cites several cases in which courts determined there were triable issues on this question, but all are distinguishable. The police officers in *Dawkins v. Graham*, 50 F.3d 532, 533 (8th Cir. 1995), mistakenly executed a search warrant on a house that was on a different street than, and a block away from, the house described in the warrant. For reasons the court has discussed, the addresses on the shared entrance to Plaintiff's building cannot be considered "objective facts" that "distinguished" her apartment from the one described in the warrant. *Id.* at 534. In *Harman v. Pollock*, 446 F.3d 1069, 1085 (10th Cir. 2006), *Liston v. County*

16

of Riverside, 120 F.3d 965, 968, 971-72 (9th Cir. 1997), and *Pray v. City of Sandusky*, 49 F.3d 1154, 1160 (6th Cir. 1995), there was evidence that the officers knew they were mistaken as soon as (or shortly after) they entered a residence and spoke with the plaintiffs, yet continued the search nonetheless. *See also Cooper v. Dailey*, No. 07-cv-2144, 2010 WL 1415986, at *5 (N.D. Ill. Mar. 31, 2010) (officers continued searching premises despite admittedly noticing "a number of inconsistencies," including that the known search targets were not present and the building was owned and occupied by a Chicago police officer and his family). Moreover, in *Pray*, some of the defendant officers had previously been inside the correct apartment while executing a prior search warrant for the same. *See* 49 F.3d at 1156. Here, there is no evidence that any of the Defendant police officers had previously executed a search warrant on the correct apartment; all of the officers testified that they had no inkling they were in the wrong location until Plaintiff said her address was 2208; and the officers exited Plaintiff's apartment about 15 seconds after she told them her address.

To summarize, no reasonable jury could conclude that the Defendant police officers should have known, before entering Plaintiff's apartment, that they were executing the search warrant on the wrong residence. Indeed, no reasonable jury could find that the Defendant police officers made anything more than an innocent mistake, and "a search resulting from an innocent mistake is not unreasonable and so does not violate the Fourth Amendment." *Balthazar v. City of Chicago*, 735 F.3d 634, 638 (7th Cir. 2013) (citing *Garrison*, 480 U.S. at 88–89). And, as noted, when Plaintiff told the officers that her address was 2208, they took her word for it and promptly exited her apartment. Accordingly, the court grants Defendants' motion for summary judgment on Plaintiff's claim that the first entry into her apartment was an unreasonable search. Because "a warrant founded on probable cause carries with it the categorical authority to detain any occupant of the subject premises during the search," *Jolliff-Blake*, 907 F.3d at 1060 (internal quotation marks omitted), the court also grants Defendants' motion for summary judgment on Plaintiff's claim for unreasonable seizure during the first entry into her apartment.

17

### b.     Second Entry

After the Defendant police officers regrouped in the vestibule, Sergeant Larson and Officer Thill returned to Plaintiff's apartment so that they could request a piece of mail that might verify her address.[3]  Plaintiff answered the door and complied with the request.  Her mail showed that she lived in a 2208 apartment, so the officers left.  During this second exchange with Plaintiff, Officer Thill stood in the entryway of her apartment for about 30 seconds and Sergeant Larson stood in the hallway.  Plaintiff argues that the second entry into her apartment "was even more unreasonable than the first" because by that time, the Defendant police officers had already "determined that they had searched the wrong apartment." (Pl.'s Opp. 9.)  Defendants maintain that the second entry into Plaintiff's apartment was an objectively reasonable execution of the search warrant.  Again, the court agrees with Defendants that their conduct did not violate the Constitution.

Contrary to Plaintiff's representations, the record does not show that when Sergeant Larson and Officer Thill returned to her apartment, they already knew it was not the target location. Nor does the record show that the resident in the vestibule "confirmed that [the Defendants] [had] searched an apartment on the wrong side of the building." (*Id.* at 9-10.)  Rather, it is undisputed that even after the first entry into Plaintiff's apartment, the officers were confused about "which side of the building was 2208 and which side was 2210." (Pl.'s L.R. 56.1 Resp. ¶ 67.)  Likewise, it is undisputed that even after discussing the addresses on the front entrance and speaking with the resident in the vestibule, the officers were uncertain and believed they might have "been in the right place." (*Id.* ¶ 68.)  It also bears repeating that Defendants had a warrant to search Apartment 1W on the second floor of the building—and Plaintiff's apartment was the only one on

---

[3] The court assumes that Plaintiff asserts her claims concerning the second search and seizure only against Sergeant Larson and Officer Thill.  (*See, e.g.*, Pl.'s Opp. 9-10 (arguing that "Defendants Thill and Larson are not entitled to summary judgment for the unconstitutional second intrusion on Plaintiff's Fourth Amendment rights").)

18

that floor marked 1W. (*See* Defs.' Reply 4, 13.) Considering this evidence, no reasonable jury could conclude that the warrant's description of the target premises was "plainly" incorrect. *Jolliff-Blake*, 907 F.3d at 1059, or that the officers' confusion was anything more than an "innocent mistake." *Balthazar*, 735 F.3d at 638. Thus, there is no genuine dispute that the officers were not required to abandon their search, and that the second search was a reasonable execution of the warrant.[4] The court grants Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claims concerning the second search and brief detention.

### B. Failure to Intervene

Plaintiff has asserted a Section 1983 claim against each Defendant police officer for failure to intervene. She alleges that none of the officers "made any effort to stop any other [officer] from entering and searching [her] residence without consent, a warrant or exigent circumstances," and thereby violated her Fourth Amendment rights to be free from unreasonable searches and seizures. (Compl. ¶¶ 48-50.) In her opposition to Defendants' motion for summary judgment, Plaintiff defends this claim only as it relates to Sergeant Larson. (*See* Pl.'s Opp. 10-11.)

A police officer may be culpable under Section 1983 if he witnessed another police officer violating a civilian's constitutional rights, "had a realistic opportunity to intervene to prevent the harm from occurring," and failed to do so. *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997) (internal quotation marks omitted). But "[i]n order for there to be a failure to intervene . . . there must exist an underlying constitutional violation." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *see also, e.g.*, *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 351 (7th Cir. 2019). Because no reasonable jury could find that any of the Defendant police officers violated Plaintiff's constitutional rights, Defendants are entitled to summary judgment on the

---

[4] Given this conclusion, the court need not address Plaintiff's argument that she has a privacy interest in "the area immediately outside [her] apartment door," where Sergeant Larson stood during the second search. (Pl.'s Opp. 10.) Similarly, because the court has concluded that no reasonable jury could find that the Defendant police officers violated Plaintiff's constitutional rights, it need not address whether they are entitled to qualified immunity.

failure to intervene claim.

**C.     Trespass / Indemnification**

Plaintiff has also asserted a state-law trespass claim against all Defendants (the police officers individually and the City via the doctrine of *respondeat superior*).  Having granted judgment in favor of Defendants on all of the federal claims before trial, the court declines to exercise jurisdiction over any supplemental state-law claims, which Plaintiff is free to pursue in state court.  *See Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010).  And having granted summary judgment, the court need not consider Plaintiff's claim for indemnification of Defendant officers under 745 ILCS 10/9-102.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment [33] is granted.

ENTER:

Dated:  March 30, 2020

_____
REBECCA R. PALLMEYER
United States District Judge